STATE OF NORTH CAROLINA v. JOHN RAY MURVIN

No. 13

(Filed 1 December 1981)

**1. Criminal Law § 46.1— evidence of defendant's flight—competent**

Evidence of flight of an accused may be admitted as some evidence of guilt. Therefore, where the evidence showed defendant told a witness of his participation in the crimes and requested that she lie for him, and that defendant's brother drove defendant to Richmond, Virginia where defendant directed a witness to purchase a ticket for him to Montreal, Canada, this evidence was sufficient to support an inference that defendant was fleeing to escape arrest and was competent on the issue of defendant's guilt. Further, the trial court did not err in allowing a witness to testify as to the reason for defendant's departure as the trial court instructed the witness to answer only if she knew, and her answer was positive and unequivocal.

**2. Criminal Law § 73.4— hearsay statement—part of the res gestae**

In a prosecution for first degree murder, the trial court did not err in allowing the witness to testify as part of the *res gestae* on direct examination that his son returned to the car and told him that defendant "had the guard on the floor." The statement was made immediately after the victim, the guard, was forced to lie on the floor, was clearly spontaneous, was relevant to the fact and issue, and was admissible despite its hearsay character as a spontaneous utterance.

**3. Criminal Law § 82.1— witness's affidavit—no attorney-client privilege—error in failing to admit not prejudicial**

The court erred in concluding that an affidavit which a witness executed was within the scope of the attorney-client privilege as an aunt and a friend were present when she made the statement to her attorney and the affidavit did not relate to a matter for which she was professionally consulting her attorney. However, the burden was on the defendant to show that he was prejudiced by the court's error, and he failed to show prejudice resulting from the exclusion of this testimony.

**4. Criminal Law § 26; Homicide § 31— armed robbery not basis for felony-murder —punishment for armed robbery and murder**

Imposition of punishment for an armed robbery conviction was entirely proper where the first degree murder conviction under the felony murder rule

was premised on the underlying felony of breaking or entering and felonious larceny, and the armed robbery conviction, because it was not submitted as an underlying felony, was neither an essential nor an indispensable element of the State's proof of murder and was not a lesser included offense of murder.

BEFORE *Stevens, Judge*, at the 1 December 1980 Criminal Session of Superior Court, NEW HANOVER County.

Defendant was tried by a jury and convicted of first degree murder, felonious breaking or entering, felonious larceny, and armed robbery. He was sentenced to life imprisonment for the first degree murder conviction and thirty years for the armed robbery conviction, to run consecutively with the life sentence. Defendant appealed his life sentence to this Court as a matter of right. We allowed his motion to bypass the Court of Appeals on the armed robbery conviction on 18 June 1981.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Ralf F. Haskell, for the State.*

*John Richard Newton for the defendant.*

CARLTON, Justice.

I.

Evidence for the State tended to show that the body of Walter J. Powers, the night guard, was found in the shop area of Almont Shipping Company in Wilmington several minutes before 7:00 a.m. on 5 January 1976. His body was lying facedown on the floor in a pool of blood. He had been shot several times in the head and back with a small caliber weapon. An inspection of the area revealed that a large window in the rear of the shop had been broken, apparently from the outside. A large bay door on the south side of the building had been pried open from the inside. Powers' body was located not far from the bay door. Several tool boxes were broken open, and some of the drawers were empty. The missing tools were owned by employees of Almont, and the value of the tools stolen from two of Almont's employees exceeded $1,000. None of the tools or pieces of equipment owned by Almont were missing.

Powers, the deceased, always carried a .38 revolver with what appeared to be pearl grips with him while on duty at Al-

mont, and he usually carried a wallet. Neither the revolver nor a wallet were found on his body. Although the time of his death could not be pinpointed, the time clock tape showed that the deceased had completed his first round between midnight and 1:00 a.m. on 5 January 1976. The cause of death was determined to be multiple small caliber bullet wounds to the left temple.

Linda Sue Albertson testified that she was living with defendant at the time of the Almont break-in. She heard defendant discuss with James H. Brown, Sr., and James H. Brown, Jr., around 6:00 or 7:00 p.m. in December or January of 1975 or 1976 "how to get tools out of big tool boxes" at Almont Shipping Company. This conversation took place before the guard was killed at Almont. The Browns did some of the talking. Brown, Jr., described where Almont was and how they could get in, and, having previously worked as a guard at Almont, he described how the guard made his rounds.

According to Ms. Albertson, defendant was at home with her on 4 January 1975 until early in the evening. He left by himself and did not say where he was going. He returned to their trailer at approximately 5:00 or 6:00 a.m. on 5 January 1976. With him he had two guns: a small brown pistol, which Ms. Albertson guessed was a .22 caliber, and a larger caliber silver- or chrome-plated pistol with tan or white handles. At that time, defendant had been carrying a pistol in his car for about two months. Defendant told Ms. Albertson "that it was better for her not to know" where he had obtained the silver gun. Defendant stayed at the trailer until the early afternoon.

That evening, on the news, Ms. Albertson heard about the incident at the Almont Shipping Company. She told defendant's brother that she had overheard the break-in being planned. When defendant returned home, Ms. Albertson asked him why he had left the guard in a puddle of blood. Defendant replied, "What did you expect me to do, clean the damn mess up?" Later that evening defendant told her that he had been in a little stall which was the storage compartment in the Almont maintenance shop with his back to the door when he heard footsteps. He turned, and the guard was behind him. The guard had his gun drawn on defendant and defendant had his gun drawn on the guard. At that moment, the younger Brown walked up behind the guard and

stuck his gun in the guard's back. Defendant made the guard lie down on the floor, and he shot him twice in the head and four times in the body.

Four days later, on 9 January 1976, Ms. Albertson and defendant went to Richmond, Virginia, where she purchased a plane ticket to Montreal, Canada, in his name. Ms. Albertson saw defendant go through the boarding gate. She testified that he was leaving North Carolina so he wouldn't get caught. He told her that if the police came looking for him, she should say that he had been at home when the guard was killed.

James H. Brown, Sr., a co-defendant in the case, testified under a grant of immunity from the State. According to this witness, he, defendant, and James H. Brown, Jr., his son, went to Almont Shipping Company on 5 January 1976. He parked the car close by. Defendant and his son went into the Almont building while he waited in the car. His son returned about twenty to thirty minutes later with a bag of tools. Shortly thereafter, defendant returned to the car carrying his own pistol, a .22, and a .38 caliber nickel-plated pistol with pearl or ivory handles. Defendant stated to him, "I had to shoot him, to shoot the guard. He could identify me." Later, defendant and the elder Brown disposed of the tools by throwing them into the ocean.

Defendant took the stand in his own behalf and denied any participation in the crimes or any knowledge of the location of Almont Shipping Company. The defendant also presented the testimony of two alibi witnesses who stated that defendant was with them during the early morning hours of 5 January 1976.

The trial court submitted the case to the jury on the charges of felony murder, felonious breaking or entering, felonious larceny and armed robbery. The jury was instructed that in order to find defendant guilty of first degree murder, it must first find him guilty of felonious breaking or entering and felonious larceny. The jury returned verdicts of guilty as charged. The trial judge arrested judgment for breaking or entering and larceny and sentenced defendant to life imprisonment for murder and thirty years for armed robbery. The armed robbery sentence was to run consecutively with the life sentence. From those sentences defendant appeals.

## II.

**[1]** Defendant first contends that the trial court erred in allowing Linda Sue Albertson to testify about his trip to Montreal, Canada, four days after the incident at the Almont Shipping Company and to state why he left North Carolina for Canada. He contends that Ms. Albertson's own testimony shows that she did not know his reason for leaving and, absent that, the evidence merely raises a conjecture of flight.

It is well established in this State that evidence of flight of an accused may be admitted as some evidence of guilt. Justice (now Chief Justice) Branch stated the rule in *State v. Lampkins*, 283 N.C. 520, 523, 196 S.E. 2d 697, 698 (1973):

> The rule in North Carolina is that flight of an accused may be admitted as some evidence of guilt. However, such evidence does not create a presumption of guilt, but may be considered with other facts and circumstances in determining whether all the circumstances amount to an admission of guilt or reflect a consciousness of guilt. Proof of flight, standing alone, is not sufficient to amount to an admission of guilt. An accused may explain admitted evidence of flight by showing other reasons for his departure or that there, in fact, had been no departure.

Moreover, that a defendant does not flee for several days after the commission of the crime goes only to the weight of the evidence and not its admissibility. *State v. Self*, 280 N.C. 665, 187 S.E. 2d 93 (1972).

These rules fully support the trial judge's action in allowing testimony concerning defendant's flight from Wilmington. Defendant told Ms. Albertson of his participation in the crimes and requested that she lie for him if questioned by the police. Four days after the crimes were committed, defendant's brother drove defendant to Richmond, Virginia, where defendant directed Ms. Albertson to purchase a ticket for him to Montreal, Canada. Clearly this evidence is sufficient to support an inference that defendant was fleeing to escape arrest and is competent on the issue of defendant's guilt. The trial court did not err in allowing the testimony of defendant's flight to be considered along with other circumstances by the jury in deciding defendant's guilt or innocence.

Defendant further contends, however, that the trial court erred in allowing Ms. Albertson to testify as to the reason for defendant's departure. At one point, when asked if she knew why he was going to Canada, Ms. Albertson stated, "I sort of guessed it." She then testified that defendant left North Carolina so he would not be caught. Defendant contends that the record shows that Ms. Albertson's testimony was based on mere conjecture and was improperly admitted. We disagree. Upon being asked again why defendant went to Canada, the trial court instructed that Ms. Albertson could answer only if she knew. Her answer was positive and unequivocal, "To leave North Carolina so he couldn't be caught." Moreover, in response to the question whether defendant had ever told her why he wanted to leave North Carolina, Ms. Albertson testified without objection, "Just other than he shot the guard." Finally, defendant was allowed to testify that his leaving North Carolina had no connection with the charge against him and that he was leaving to get away from Ms. Albertson because she had been "running around on him." The jury, therefore, had before it his testimony giving reason for his departure from the state and could decide whether defendant's trip to Canada was, in fact, taken to avoid arrest.

Clearly, this evidence, taken as a whole, tends to show that defendant fled the State following commission of the crimes charged in order to avoid arrest and prosecution and, as such, was competent on the issue of his guilt. The challenged testimony was properly admitted, and these assignments are without merit.

### III.

[2] Defendant next contends that the trial court erred in allowing James H. Brown, Sr., to testify on direct examination that his son returned to the car and told him that defendant "had the guard on the floor." The trial court overruled defendant's objection, stating that the testimony was part of the *res gestae*. Defendant contends that the testimony was hearsay which does not fall within any exception to the hearsay rule. We agree with the trial court and find that the statement was properly admitted.

Evidence is hearsay when its probative force depends, in whole or in part, upon the competency and credibility of some person other than the witness who is testifying. 1 Stansbury, *North Carolina Evidence* § 138, at 458 (Brandis rev. 1973). "The

inherent vice of hearsay testimony consists in the fact that it derives its value not from the credibility of the witness himself, but depends upon the veracity and credibility of some other person from whom the witness got his information." *State v. Lassiter*, 191 N.C. 210, 212, 131 S.E. 577, 579 (1926). Hearsay evidence is inadmissible unless it falls within one of the recognized exceptions to the hearsay rule. 1 Stansbury, *supra* at § 138.

Here, the witness's testimony was clearly hearsay. Its probative value depended on the competency and credibility of a person other than the witness testifying. Indeed, the person to whom the statement was attributed was not present at trial. The propriety of the trial court's ruling, therefore, depends upon whether the testimony in question falls within one of the recognized exceptions to the hearsay rule. In our opinion, the hearsay testimony was a part of the *res gestae* and therefore was properly admitted.

While difficult to define, the so-called *res gestae* principle generally applies to those situations in which "words accompany and are connected with non-verbal conduct or external events and carries the general idea of something said while something is happening or is being done." 1 Stansbury, *supra* at § 158; *accord, State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1976). One component of the theory generally referred to as *res gestae* is the spontaneous utterance. A spontaneous utterance is a statement or exclamation of a participant or an observer concerning an unusual or startling event made in response to the stimulus of the event and without time for reflection or fabrication. 1 Stansbury, *supra* at § 164. The rationale for the admissibility of such a statement is that its trustworthiness is guaranteed by the immediacy of the response to an unusual event. When a statement is made under those circumstances, it is unlikely that the declarant fabricated its substance. The trustworthiness of such a statement lies in the excitement of the event and the immediacy of the response.

This Court has long recognized the spontaneous or excited utterance exception to the hearsay rule under the generic term *res gestae* and has established criteria for admission of such statements: (1) the declaration must be of such spontaneous character as to preclude the likelihood of reflection or fabrication, (2) it must be made contemporaneously with the transaction or so closely connected with the event as to be practically inseparable,

and (3) it must have some relevance to the facts sought to be proved. *Hargett v. Jefferson Standard Insurance Co.*, 258 N.C. 10, 128 S.E. 2d 26 (1962); *Little v. Power Brake Co.*, 255 N.C. 451, 121 S.E. 2d 889 (1961); *Coley v. Phillips*, 224 N.C. 618, 31 S.E. 2d 757 (1944); 1 Stansbury, *supra* at § 164.

In the case *sub judice* the statement sought to be introduced, that defendant had the guard on the floor, was made by a participant in the robbery as he was carrying the stolen tools to the get-away vehicle to his accomplice. This statement was made immediately after the guard was forced to lie on the floor, was clearly spontaneous, and is relevant to the facts in issue. As such, it is a spontaneous utterance and is admissible despite its hearsay character, and the trial court properly admitted it into evidence. This assignment of error is overruled.

IV.

[3]  On cross-examination of State witness Linda Sue Albertson, counsel for defendant asked about statements contained in an affidavit which Ms. Albertson had executed before her attorney. The State objected and the trial judge conducted a *voir dire*. He concluded that the affidavit was a communication which came within the scope of the attorney-client privilege and sustained the State's objection. Judge Stevens also ruled that the attorney before whom Ms. Albertson made the statement would not be allowed to testify about the affidavit. Defendant contends that the affidavit was not a privileged communication and that the trial judge erred in refusing to allow defense counsel to question Ms. Albertson about statements contained therein.

Ms. Albertson executed the affidavit on 13 May 1980 in her attorney's office. At the time of its making, she had employed the attorney to represent her in a criminal matter unrelated to the present case, and an attorney-client relationship existed. The statements contained in the affidavit were made in the presence of Ms. Albertson's attorney, her aunt and a friend. Essentially, the affidavit states that Ms. Albertson had been questioned by law enforcement officers during February of 1980 about the Almont incident and that she told them that all she knew about the incident was what she had heard on the news. She also stated that she had asked "one Mr. Murvin why he had left the man in a

pool of blood and he stated jokingly that she would not have expected him to clean it up."

It is a well-established rule in this jurisdiction that when the relationship of attorney and client exists, all confidential communications made by the latter to his attorney on the faith of such relationship are privileged and may not be disclosed. *State v. Van Landingham*, 283 N.C. 589, 197 S.E. 2d 539 (1973). A privilege exists if (1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although litigation need not be contemplated and (5) the client has not waived the privilege. 1 Stansbury, *supra* at § 62. An examination of the circumstances surrounding the execution of the affidavit reveal that it was not a privileged communication. The challenged communication was not private and confidential as between Ms. Albertson and her attorney. Communications between attorney and client generally are not privileged when made in the presence of a third person who is not an agent of either party. *See* McCormick, *Evidence* § 91 (1972). Here, an aunt and a friend of Ms. Albertson were present when she made the statement to her attorney. Although the cases discussing whether the privilege exists when relatives or friends of the client are present during the communication are in conflict, *compare State v. Van Landingham*, 283 N.C. 589, 197 S.E. 2d 539 (1973) (presence of client's wife destroys privilege) *with Bowers v. State*, 29 Ohio St. 542 (1876) (mother's presence during daughter-client's conference with attorney concerning bastardy proceedings does not destroy privilege), we think the presence here of persons other than the attorney and client destroyed the privilege. The presence of neither the aunt nor the friend was necessary for the protection of Ms. Albertson's interests. *See* McCormick, *supra* at § 91, at 189.

Additionally, the communication did not relate to a matter concerning which Ms. Albertson had employed her attorney or for which she was professionally consulting him. The record discloses that Ms. Albertson was arrested on the evening of giving the affidavit to her attorney for receiving stolen goods. Ms. Albertson apparently was consulting with counsel with respect to that

charge. When asked if the affidavit had anything to do with "what the law was trying to find you for," Ms. Albertson responded negatively.

Because we find that the affidavit is not a privileged communication to which the attorney-client privilege attaches, we do not consider whether the privilege may be asserted by the State on behalf of its witness.

Defendant is not, however, entitled to a new trial by virtue of the trial court's error in this respect.

> Not every erroneous ruling on the admissibility of evidence will result in a new trial being ordered. When the reviewing court is convinced that justice has been done and that evidence which was excluded would not, if admitted, have changed the result of the trial, a new trial will not be granted. So also where evidence has been improperly admitted.

1 Stansbury, *supra* at § 9, at 20. The burden is on the appellant not only to show error but to show that he was prejudiced or that the verdict of the jury was probably influenced thereby. G.S. § 15A-1443(a) (1978); *State v. Cross*, 284 N.C. 174, 200 S.E. 2d 27 (1973).

Here, defendant has shown no prejudice resulting from the exclusion of this testimony and we perceive none. The evidence of his guilt was otherwise overwhelming. In addition to the testimony of Ms. Albertson, James H. Brown, Sr., testified without objection that defendant stated to him, "I had told him, I had to shoot him, to shoot the guard. He could identify me." Other testimony from Ms. Albertson, not inconsistent with anything contained in the affidavit in question, included defendant's statement to her that while in the storage compartment of the maintenance shop, he shot the guard twice in the head and four times through the body. We hold, therefore, that the trial court's exclusion of the witness's prior inconsistent statement was not prejudicial since there is no reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial.

## V.

[4]  Defendant next contends that the trial court erred in failing to arrest judgment on his conviction of armed robbery. Defendant, relying on *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972), argues that the armed robbery was a lesser included offense of the felony murder and that the separate sentence of thirty years imposed for that crime should have been arrested. Defendant's reliance of *Thompson* is misplaced.

Defendant correctly notes that this Court held in *Thompson* that where conviction of a defendant for felony murder is based on a finding that murder was committed in the perpetration of a felony, the underlying felony is a lesser included offense of the felony murder and, therefore, separate punishment may not be imposed for the underlying felony. *See also State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941 (1980). In *Thompson*, Chief Justice Bobbitt stated:

> The conviction of defendant for felony-murder, that is, murder in the first degree without proof of malice, premeditation or deliberation, was based on a finding by the jury that the murder was committed in the perpetration of the felonious breaking and entering. In this sense, the felonious breaking and entering was a lesser included offense of the felony-murder. Hence, the separate verdict of guilty of felonious breaking and entering affords no basis for additional punishment. If defendant had been acquitted in a prior trial of the separate charge of felonious breaking and entering, a plea of former jeopardy would have precluded subsequent prosecution on the theory of felony-murder.

*Id*. at 216, 185 S.E. 2d at 675. The armed robbery was not the underlying felony which allowed the jury to convict defendant of first degree murder. The trial court's instructions reveal that the only felonies upon which defendant's first degree murder conviction could be based were breaking or entering and larceny. Thus, the first degree murder conviction under the felony murder rule was premised on the underlying felonies of breaking or entering and felonious larceny. The trial court properly arrested judgment on those charges. The armed robbery conviction, because it was not submitted as an underlying felony, is neither an essential nor an indispensable element of the State's proof of murder and was

not a lesser included offense of murder. Thus, imposition of punishment for the armed robbery conviction was entirely proper. *See State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976).

We conclude that defendant had a fair trial, free from prejudicial error. In the proceedings below, we find

No error.