STATE OF NORTH CAROLINA v. HUBERT McINTOSH

No. 204A93

(Filed 17 June 1994)

1. **Evidence and Witnesses § 2636 (NCI4th)— attorney's statement to deputy—authorization by defendant—no violation of attorney-client privilege**

Where the uncontroverted evidence in a murder case tended to show that defendant consulted with an attorney solely in order to facilitate defendant's safe surrender to the authorities, the attorney-client privilege was not violated by the attorney's statement to a deputy sheriff that the defendant had "come into his office to turn himself in, in reference to a shooting," since that portion of defendant's communication was not intended to be confidential because it was given to the attorney for the purpose of conveying the information contained therein to the law enforcement authorities to whom the defendant wanted to surrender.

**Am Jur 2d, Witnesses §§ 185-190.**

STATE v. McINTOSH

[336 N.C. 517 (1994)]

**Attorney-client privilege as affected by its assertion as to communications, or transmission of evidence, relating to crime already committed. 16 ALR3d 1029.**

2. **Constitutional Law § 290 (NCI4th) — attorney's statements to deputy — attorney-client privilege not violated — no ineffective assistance of counsel**

An attorney's statement to a deputy sheriff that defendant had come into his office to turn himself in for a shooting did not constitute ineffective assistance of counsel where defendant consulted the attorney for the sole purpose of defendant's safe surrender to the authorities, and the attorney's statement to the deputy was made by direct authorization of the defendant and did not violate the attorney-client privilege.

**Am Jur 2d, Criminal Law §§ 752, 985-987.**

**Adequacy of defense counsel's representation of criminal client regarding confessions and related matters. 7 ALR4th 942.**

**When is attorney's representation of criminal defendant so deficient as to constitute denial of federal constitutional right to effective assistance of counsel — Supreme Court cases. 83 L. Ed 2d 1112.**

3. **Evidence and Witnesses § 1218 (NCI4th) — inculpatory statements — fruit of attorney's statement to deputy — admissibility**

The trial court did not err by admitting defendant's inculpatory statements in a murder case even if they were the fruit of an attorney's statement to a deputy sheriff that defendant had come into his office to turn himself in for a shooting where defendant consulted the attorney for the sole purpose of his safe surrender to the authorities, the attorney did exactly what defendant requested, and no confidential information was disclosed. Furthermore, it was not error for the trial court to admit defendant's statements even if they disclosed the substance of the attorney's remark to the deputy.

**Am Jur 2d, Evidence §§ 543 et seq.**

**Admissibility of pretrial confession of criminal case — Supreme Court cases. 22 L. Ed 2d 872.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment entered by Hight, J., on 5 June 1992, in the Superior Court,

Hoke County, sentencing the defendant to life imprisonment for first-degree murder. Heard in the Supreme Court on 16 March 1994.

*Michael F. Easley, Attorney General, by Thomas J. Ziko, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for the defendant-appellant.*

MITCHELL, Justice.

The defendant, Hubert McIntosh, was indicted for first-degree murder by the Hoke County Grand Jury on 23 March 1992. He was tried noncapitally at the 9 February 1993 Criminal Session of Superior Court, Hoke County. The jury found the defendant guilty of first-degree murder, and the trial court sentenced him to the mandatory term of life imprisonment. The defendant appealed to this Court as a matter of right from the judgment sentencing him to life imprisonment for first-degree murder. *See* N.C.G.S. § 7A-27(a) (1989).

Prior to trial, the defendant moved to suppress certain testimony of Bobbie Burns McNeil, a licensed attorney-at-law, and certain testimony of Hoke County Deputy Sheriff Greg Beard. The defendant contended that such evidence was the product of violations to the defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States, Article I, Sections 18, 19 and 23 of the Constitution of North Carolina, N.C.G.S. § 8-54 and Chapter 15A of the North Carolina General Statutes. We do not agree.

During a hearing on the defendant's motion, Deputy Beard testified that at approximately 3:00 p.m. on 4 October 1991 a secretary in the Hoke County Sheriff's Office informed him that she had received a telephone call. The caller had stated that "they needed an officer around at the McNeil Hostetler office in reference to someone there—about a shooting." After receiving that information, Deputy Beard drove to the law offices of Hostetler & McNeil.

When Beard arrived at the law offices, he met Bobby Burns McNeil, attorney-at-law, and another man in an open area in the front office. McNeil "indicated that this gentlemen had come to his office to turn himself in, in reference to a shooting . . . ." McNeil gestured toward the defendant who was seated on a couch

next to the door. The defendant stated that he had a gun in his car and that he wanted to turn it over to Beard. McNeil then told the defendant, "Do whatever it is that you want to do." The defendant then got up and went outside.

Once outside, the defendant directed the deputy to his car and pointed to a gun and a holster on the floorboard. Deputy Beard picked up the gun and asked the defendant to take a seat in his patrol car. Deputy Beard then asked the defendant where the shooting had taken place. The defendant stated that it was behind a business named the "Hitching Post." Beard then asked the defendant about the condition of the victim. The defendant indicated that "he had shot her six times and that she wasn't going anywhere."

As Beard drove with the defendant toward the Hitching Post, Beard advised the defendant of his constitutional rights. At that time the defendant stated that he did not want to answer any questions until his lawyer was present. Without further questioning, however, the defendant then stated "that there was no reason for [Beard] to drive as fast as [he] was driving. He had shot her six times and she was not going anywhere."

Once they arrived at the Hitching Post, the defendant directed the deputy to the victim's mobile home nearby. Deputy Beard went to the home and discovered that all of the doors were locked. Beard forced his way in, and found the body of the female victim, Jessie McBryde. He then returned to his patrol car and placed handcuffs on the defendant.

Counsel for the defendant cross-examined Beard regarding his notes of his conversation with Mr. McNeil. Beard testified that his report regarding the call to the secretary stated only "that Mr. McNeil had a subject in his office that wanted to turn himself in to the Sheriff's Department" and made no reference to the shooting. Responding directly to a question by the defendant's counsel, Beard also testified that his notes showed that, "Mr. McNeil told [Deputy Beard] that [the man in his office] had shot a lady and wanted to turn himself in, and that he didn't want anybody to hurt the gentleman."

After considering the arguments of counsel, the trial court found: that at no time prior to the discovery of the gun had Beard been told not to question the defendant out of the presence of

a lawyer; that no action by Beard was coercive; that the defendant was not in custody at the time the statements at issue were made to Beard; that the defendant, after consulting with his attorney, made statements to law enforcement agencies but that he was under no compulsion at any time to make any statements; and that any questions regarding the location of the shooting were necessary to provide emergency assistance to the victim. The trial court denied the motion to suppress evidence of statements that the defendant had made to Deputy Beard. However, the trial court did order that no evidence concerning McNeil's statements to Deputy Beard be introduced at trial. Thereafter, a jury was selected and the defendant's case was called for trial.

The defendant's arguments on appeal make a full recitation of the evidence presented at trial unnecessary. The evidence at trial tended to show that the victim, Jessie McBryde, and the defendant, Hubert McIntosh, had been dating each other for six to eight months. A week or two before the victim's death, her sister heard the victim tell the defendant, "stay away from me, leave me alone."

On 3 October 1991, Ray McBryde, the victim's son, was on leave from the United States Marine Corps and was staying in his mother's mobile home. He knew that his mother and the defendant had been dating, but she had asked him in September or early October not to let the defendant enter her residence. On 3 October, the day before the victim's body was found, the defendant came to the victim's home after she had left for work. The victim's son was at home and the defendant spoke to him. The victim's son testified that the defendant told him to tell his mother to stop playing games because "he would kill her and get away with it." The victim's son further testified that the defendant stated that "he ain't got time to go to jail over no woman." The defendant then told the victim's son and the victim's daughter, who was also present, that they "had come close to not having a mother." The defendant said that he would have shot her if he had his gun. The victim's son told the defendant to leave and the defendant did so.

Mack Dockery testified that he had been friends with the defendant for thirty years. He saw the defendant at the defendant's sister's house on 4 October 1991, at approximately 1:45 p.m. The defendant left the house at approximately 2:00 p.m. The defendant

returned approximately forty-five minutes later, gave his sister his house key and car keys and stated, "I just shot Jessie." The defendant then asked another friend, Larry McPhaul, to drive him to his lawyer's office. Dockery knew that the defendant's lawyer was Bobbie McNeil. McPhaul, Dockery and the defendant went in the defendant's car to McNeil's office. On the way, the defendant stated that "he did what he had to do," and said that the victim had advanced towards him with a weapon. Dockery and McPhaul remained in the car while the defendant entered McNeil's office. While they were waiting there, they noticed a pistol lying on the passenger's side floorboard of the car.

About ten minutes after they arrived at McNeil's office, a deputy sheriff drove up. The deputy went into McNeil's office and returned about five minutes later with the defendant. The defendant and the deputy approached the defendant's car, and the defendant gave the gun on the floorboard to the deputy. The deputy asked McPhaul and Dockery whether they had been with the defendant, and they answered that they had just driven him downtown. The deputy and the defendant left in the deputy's patrol car.

Deputy Sheriff Beard testified that he went to the law offices of McNeil & Hostetler in Raeford, North Carolina at approximately 3:00 p.m. on 4 October 1991. He walked into the office and saw McNeil and the defendant in the foyer. The defendant was seated on a couch. Deputy Beard, who was dressed in plain clothes, identified himself and had a brief conversation with McNeil. At the end of their conversation, the defendant stood up and stated that he had a gun that he wanted to turn over to Beard. Beard and the defendant left the office and approached the passenger's side of the defendant's car. The defendant retrieved a .357-caliber handgun from the passenger side floorboard. It was loaded with six rounds of ammunition.

Deputy Beard told the defendant to take a seat in his patrol car. He then asked the defendant where the shooting had taken place, and the defendant indicated that it had occurred behind the Hitching Post. Beard asked the defendant the condition of the victim, and the defendant stated that he had shot her six times and that she was not going anywhere. Beard then activated his siren and blue light and drove toward the Hitching Post. Beard advised the defendant of his constitutional rights, and the defendant indicated that he understood them. The defendant then com-

mented that there was no need for Beard to speed and repeated that he had shot the victim six times and that she was not going anywhere.

When Beard and the defendant reached the Hitching Post, the defendant directed Beard to turn onto a dirt road beside that establishment. The defendant then directed Beard into a mobile home park where the victim's mobile home was located. Beard approached the mobile home and found both doors locked. He broke the lock on the front door and entered the mobile home. He found the body of the victim lying on the floor between the kitchen and a bedroom; the victim was dead. Beard then went outside and handcuffed the defendant. A later autopsy revealed that the victim had died from multiple gunshot wounds.

By an assignment of error, the defendant contends that the trial court erred by failing to suppress his statements which were made as a result of a violation of his attorney-client privilege and of his constitutional right to effective assistance of counsel. We disagree.

The defendant contends that his inculpatory statements were made to Deputy Beard as the direct result of unauthorized disclosure by his counsel of privileged attorney-client communications. It is a well-established rule in this jurisdiction that when the relationship of attorney and client exists, all confidential communications made by the client to his attorney on the faith of such relationship are privileged and may not be disclosed. *State v. Ballard*, 333 N.C. 515, 428 S.E.2d 178, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 438 (1993); *State v. Taylor*, 327 N.C. 147, 393 S.E.2d 801 (1990); *State v. Van Landingham*, 283 N.C. 589, 197 S.E.2d 539 (1973); *Fuller v. Knights of Pythias*, 129 N.C. 318, 40 S.E. 65 (1901). However, the attorney-client privilege "depends on the assumption that full and frank communication will be fostered by the assurance of confidentiality, and the justification for granting the privilege ceases when the client does not appear to have been desirous of secrecy." *Permian Corp. v. United States*, 665 F.2d 1214 (D.C. Cir. 1981).

A privilege exists if (1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although

litigation need not be contemplated and (5) the client has not
waived the privilege.

*State v. Murvin*, 304 N.C. 523, 531, 284 S.E.2d 289, 294 (1981).

But the mere fact the evidence relates to communications be-
tween attorney and client alone does not require its exclusion.
Only confidential communications are protected. If it appears
by extraneous evidence or from the nature of a transaction
or communication that they were not regarded as confidential,
*or that they were made for the purpose of being conveyed
by the attorney to others*, they are stripped of the idea of
a confidential disclosure and are not privileged.

*Dobais v. White*, 240 N.C. 680, 684-85, 83 S.E.2d 785, 788 (1954)
(emphasis added) (citations omitted).

[1]  Uncontroverted evidence in this case tended to show that the
defendant consulted with McNeil *solely* in order to facilitate the
defendant's safe surrender. Therefore, the defendant necessarily
authorized McNeil to inform law enforcement authorities that the
defendant had "come into his office to turn himself in, in reference
to a shooting." Consequently, that portion of the defendant's com-
munication was not intended to be confidential, because it was
given to McNeil for the purpose of conveying the information con-
tained therein to the law enforcement authorities to whom the
defendant wanted to surrender. If the defendant wanted the benefit
of McNeil's representation of him during his surrender, *i.e.* safe
transfer into custody of the sheriff, either the defendant or McNeil
had to tell Deputy Beard why the defendant should be placed
into custody. Therefore, that information was not privileged and
McNeil did not violate the attorney-client privilege.

We note here that the trial court allowed the defendant's pretrial
motion with regard to statements by McNeil to Deputy Beard
and held that the State could not introduce evidence of those
statements at trial. In any event, since we have concluded that
the information given Deputy Beard by McNeil did not violate
the attorney-client privilege, introduction of evidence of McNeil's
remarks by either the State or the defendant would not have been
error.

The defendant next contends in support of his assignment of error that his own inculpatory statements to Beard were a direct result of the coercive effect of McNeil's violation of the attorney-client privilege. As we have concluded that McNeil did not violate the attorney-client privilege by any unauthorized disclosure of privileged information, we further conclude that this argument is without merit.

[2] Next, the defendant contends that McNeil's unauthorized disclosure of privileged information constituted *per se* ineffective assistance of counsel. Because we have determined that McNeil's statements to Deputy Beard were made by direct authorization of the defendant and did not violate the attorney-client privilege, this argument must fail. The defendant retained McNeil for the sole purpose of the defendant's safe surrender to the authorities for the crime that he had committed. At the time that McNeil had contacted the police and insured that his client had surrendered safely to the authorities, McNeil had properly and completely fulfilled his obligations to his client.

[3] The defendant further contends that McNeil's disclosure violated his right to due process. In *United States v. Schnell*, 775 F.2d 559, 565 (4th Cir. 1985), *cert. denied*, 475 U.S. 1098, 89 L. Ed. 2d 898 (1986), the United States Court of Appeals for the Fourth Circuit held that when an attorney discloses confidential information to the prosecution, such action is "fundamentally unfair and inherently prejudicial." Because McNeil, in doing exactly what his client requested, did not disclose any confidential information, the trial court did not err in the present case by admitting the defendant's inculpatory statements even if they were the fruit of McNeil's statements to Deputy Beard.

Finally, the defendant argues that there was no way to admit his own statements to Deputy Beard into evidence without revealing to the jury the substance of McNeil's remarks. Assuming *arguendo* that this is correct, we nevertheless find no error. As we have previously determined that all statements made by McNeil to Beard were fully authorized by the defendant and did not constitute a breach of the attorney-client privilege or any other right of the defendant, it was not error for the trial court to allow evidence of the defendant's statements to be admitted even if they did reveal the substance of McNeil's remarks.

The defendant's assignment of error is without merit. Therefore, we hold that the defendant received a fair trial free of prejudicial error.

NO ERROR.