STATE OF NORTH CAROLINA v. TERESA WATSON JORDAN

No. COA03-184

(Filed 20 January 2004)

**1. Accomplices and Accessories— accessory after the fact— motion to dismiss—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the charge of accessory after the fact to voluntary manslaughter, because the State proved the three elements that: (1) the principal committed the manslaughter; (2) defendant gave personal assistance to the principal to aid in his escaping detection, arrest, or punishment; and (3) defendant knew that the principal committed the felony.

**2. Evidence— impeachment—reversed conviction**

The trial court did not err in an accessory after the fact to voluntary manslaughter case by excluding evidence of the principal husband's significantly higher sentence after his jury trial in comparison to the sentence later imposed pursuant to a plea agreement even though defendant contends it prevented her from impeaching the principal's testimony, because: (1) the effect of a

**STATE v. JORDAN**

[162 N.C. App. 308 (2004)]

reversal is to overturn a conviction, and N.C.G.S. § 8C-1, Rule 609 does not envision the usage of convictions that either have not come to fruition or have become nullities; and (2) although defendant attempted to raise a constitutional claim in her brief, she failed to include it in her assignments of error.

### 3. Evidence— testimony—privileged matter—attorney-client relationship

The trial court did not err in an accessory after the fact to voluntary manslaughter case by allowing the State to question her regarding alleged privileged matter between defendant and an attorney, because: (1) defendant's answers indicate that there was no attorney-client relationship between defendant and her husband's attorney; and (2) defendant did not reveal the content of any communication between herself and her husband's attorney, as defendant did not recall speaking to the attorney, and if she did, could not remember what she said.

### 4. Criminal Law— prosecutor's argument—personal beliefs

The trial court did err in an accessory after the fact to voluntary manslaughter case by allowing the State to reference during closing arguments the impact of the evidence on the decision of the principal's attorney to pursue a plea for his client, because: (1) the State simply raised the reasonable question inferred from the evidence adduced at trial; and (2) this question was not an injection of personal beliefs and matters outside the record.

Appeal by defendant from judgment dated 29 August 2002 by Judge Hal G. Harrison in Watauga County Superior Court. Heard in the Court of Appeals 12 November 2003.

*Attorney General Roy Cooper, by Special Deputy Attorney General E. Burke Haywood, for the State.*

*William D. Auman for defendant-appellant.*

BRYANT, Judge.

Teresa Watson Jordan (defendant) appeals a judgment dated 29 August 2002 entered consistent with a jury verdict finding her guilty of being an accessory after the fact to voluntary manslaughter.

On 16 August 1999, defendant was indicted for being an accessory after the fact to the murder on 14 January 1999 of Christopher

Pendley by Kenneth Ray Jordan (Jordan), defendant's husband. At trial, the evidence revealed that Jordan had been previously tried and found guilty by a jury of voluntary manslaughter for having shot and killed Pendley while Pendley was a guest in his home. The Court of Appeals reversed Jordan's conviction and granted him a new trial. *See State v. Jordan*, 149 N.C. App. 838, 562 S.E.2d 465 (2002). Jordan subsequently pled guilty to voluntary manslaughter. When defense counsel attempted to question Jordan regarding the sentence he had received based on the jury trial, the trial court sustained the State's objection to this line of questioning. Jordan testified that according to the plea agreement he had entered, he received the minimum sentence for which he was eligible. In addition, Jordan had agreed to make a statement to Detective Mark Shook. Jordan further testified that he and defendant had been separated since his incarceration on 16 May 2000.

Jordan explained that on the evening of 13 January 1999, he, defendant, Pendley, and Monique Harmon, another guest, were in the home he shared with defendant where they consumed alcohol, marijuana, and Xanax. Jordan shot Pendley after seeing Pendley and defendant together in the living room. Jordan accused Pendley of "being with [his] wife," and an altercation started that ended with a fatal gunshot wound to Pendley's neck. After the shooting, defendant suggested to Jordan and Harmon "we could make it look like a rape." Jordan testified that he never saw Pendley rape defendant and that he did not shoot Pendley because Pendley was trying to rape his wife. Harmon also testified that Pendley's body was fully clothed when she saw his body lying on the floor after the shooting.

Richie Greene, defendant's friend, testified that, in the early morning hours of 14 January 1999, defendant and Jordan came to his residence and woke him up. Defendant told Greene that Jordan had shot someone and asked Greene what she should do. When asked by the State if defendant ever told Greene why Jordan had shot someone, Greene stated "she said she was being raped." Greene did not observe any injuries on defendant or tears in her clothing. The only thing Greene noted were defendant's eyes, which were swollen from crying. Sherry Rominger, Greene's girlfriend, was also present during this visit and testified defendant had stated that Jordan "shot a guy" who "was trying to rape her."

According to Laraye Rudisill, a certified sexual assault nurse examiner at the Emergency Department of the Watauga County Medical Center, defendant arrived at the hospital on 14 January 1999

**STATE v. JORDAN**

[162 N.C. App. 308 (2004)]

teary-eyed and told her she had been sexually assaulted by Pendley, her husband's friend, until Jordan had found them and "kicked [Pendley] off." Rudisill prepared an evidence kit that included defendant's shirt, which defendant claimed Pendley had ripped off during the assault. As part of her physical examination of defendant, Rudisill noted bruises on defendant's left cheek, shoulder, and arm, a red mark on defendant's right chest, and a small fracture to her nose.

Detective Shook with the Watauga County Sheriff's Office interviewed defendant at the hospital. Initially, defendant notified Detective Shook that Scott Casey, an attorney who represented Jordan, told her not to talk to him. After some initial hesitation, defendant then told the detective that Pendley had forced her to the living room floor and pulled off all her clothes after Jordan had left to buy some beer. Pendley had pulled off his jeans and "started trying to penetrate her with his hands and penis." Defendant was not sure whether he actually penetrated her. When Jordan came home, he fought with Pendley for a few minutes and then went down the hall to get his gun. The gun went off as Pendley grabbed its barrel. Thereafter, defendant and Jordan left the house.

Lisa Ann Watkins, a housekeeper at an inn defendant checked into after the shooting, testified that she found several shirt buttons on the floor of the room defendant had occupied. Watkins later handed the buttons over to the police when they came to look at the room. Jonathan Dilday, special agent with the North Carolina State Bureau of Investigation, compared the collected buttons, which "appear[ed] to have been torn off," and the thread remaining on them to the buttons on the shirt the police had received from defendant and concluded that the buttons "could have originated from the . . . shirt" because he could "see no difference in the material."

Defendant testified in her defense, stating that Pendley had started taking a sexual interest in her and she had been wrestling with him on the living room floor until Jordan found them. Pendley then put on his shorts and started walking down the hall with Jordan as the two men argued. Defendant ran outside and suddenly heard a gunshot.

---

The issues are whether the trial court erred in: (I) denying defendant's motion to dismiss; (II) excluding evidence of Jordan's sentence following his conviction by jury; (III) allowing questions regarding privileged matter; and (IV) allowing the State

to speculate during its closing argument regarding the conduct of Jordan's attorney.

I

[1] In ruling on a motion to dismiss, the court must determine whether there is substantial evidence of each essential element of the offense charged and whether defendant was the perpetrator of that offense. *State v. Abraham*, 338 N.C. 315, 328, 451 S.E.2d 131, 137 (1994). " 'Substantial evidence' is that amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* The court must consider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from it and resolving any contradiction in the evidence in its favor. *Id.* In order to convict defendant of being an accessory after the fact to voluntary manslaughter, the State must prove that: (1) Jordan, the principal, committed the manslaughter; (2) defendant gave personal assistance to Jordan to aid in his escaping detection, arrest, or punishment; and (3) defendant knew that Jordan committed the felony. *See State v. Barnes*, 116 N.C. App. 311, 316, 447 S.E.2d 478, 480 (1994); N.C.G.S. § 14-7 (2001).

In this case, Jordan testified that he pled guilty to the voluntary manslaughter of Pendley, thus satisfying the first element. As to the second element of the offense, Jordan and Harmon testified that defendant had suggested evading punishment for the offense by claiming that Pendley had attempted to rape her. On the day of the fatal shooting, defendant told Greene and his girlfriend that Jordan had shot Pendley because he was trying to rape her. Greene did not observe any tearing on defendant's clothes when he saw her that day, and the buttons found at the inn indicate defendant's shirt was not torn until after Pendley's death. In addition, defendant went to the hospital where she told the examining nurse that she had been sexually assaulted and thereafter reported the incident to the police. Although defendant testified at trial that Pendley had indeed attempted to rape her, " 'contradictions and discrepancies are for the jury to resolve and do not warrant dismissal.' " *State v. Vause*, 328 N.C. 231, 237, 400 S.E.2d 57, 61 (1991) (citation omitted). Finally, there was evidence defendant knew that Jordan had shot Pendley. By her own testimony, defendant admitted to having heard a gunshot after seeing Jordan and Pendley arguing, and Greene and Rominger testified that defendant came to their home in the early morning hours of 14 January 1999 and told them Jordan had shot someone.

Accordingly, there was substantial evidence as to each essential element of the offense charged, and the trial court properly denied defendant's motion to dismiss.

## II

**[2]** Defendant next contends the trial court erred in excluding evidence of Jordan's significantly higher sentence after his jury trial in comparison to the sentence later imposed pursuant to the plea agreement, as this prevented defendant from impeaching Jordan's testimony. We disagree.

Rule 609 of the North Carolina Rules of Evidence provides that "[f]or the purpose of attacking the credibility of a witness,. evidence that the witness has been convicted of a felony . . . shall be admitted if elicited from the witness or established by public record during cross-examination or thereafter." N.C.G.S. § 8C-1, Rule 609(a) (2001). The determinative factor in this case is whether Jordan's reversed conviction may be used for impeachment under Rule 609.

A reversal is defined as "[a]n appellate court's overturning of a lower court's decision." *Black's Law Dictionary* 1320 (7th ed. 1999). In the legal context, "overturn" means "[t]o invalidate." *The American Heritage College Dictionary* 976 (3d ed. 1993). Hence, the effect of a reversal is to overturn a conviction, thereby invalidating it. As Rule 609 does not envision the usage of convictions that either have not come to fruition or have become nullities, the trial court did not err in denying defense counsel's attempt to elicit testimony from Jordan regarding his reversed sentence. *See State v. Corey*, 199 N.C. 209, 211, 153 S.E. 923, 924 (1930) ("the reversal of [a] judgment has the force and effect of a verdict of 'not guilty' "); *State v. Johnson*, 128 N.C. App. 361, 369, 496 S.E.2d 805, 810 (1998) (where the defendant's case was dismissed, his two arrests could not be used for impeachment purposes).

With respect to her discussion on this assignment of error, defendant also raised a constitutional argument in her brief not contained in her assignments of error included in the record on appeal. As the scope on appeal is limited to the assignments of error noted in the record, we do not address this argument. *See* N.C.R. App. P. 10(a).

## III

**[3]** Defendant further asserts that the trial court erred in allowing the State to question her regarding privileged matter.

It is a well-established rule in this jurisdiction that when the relationship of attorney and client exists, all confidential communications made by the latter to his attorney on the faith of such relationship are privileged and may not be disclosed. A privilege exists if (1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although litigation need not be contemplated and (5) the client has not waived the privilege.

*State v. Murvin*, 304 N.C. 523, 531, 284 S.E.2d 289, 294 (1981).

In this case, defendant takes issue with the following exchange during the State's recross-examination of defendant:

Q: Ma'am, when was it after you left [Jordan's] mother's house, when was it you went to the lawyer?

A: I believe his mother took me up there the next day.

Q: You told the people there when you talked to Ms. Rudisill that you had already talked to a lawyer and the lawyer told you not to turn the shirt over to them.

A: That was [Jordan's] attorney, Scott Casey. I don't recall speaking to him, but I probably did speak to him at the Sheriff's Department.

Q: So, you had already consulted with a lawyer?

A: Yes.

. . . .

Q: So, when you got [to the Sheriff's Department], you talked to a lawyer about the story you were going to tell about the rape?

[DEFENDANT]: Objection.

A: I don't recall what was said at the Sheriff's Department, I was still under the influence of Xanax[.]

[STATE]: That is all.

Defendant's answers clearly indicate that there was no attorney-client relationship between defendant and Jordan's attorney. Moreover, defendant did not reveal the content of any communica-

tion between herself and Jordan's attorney, as defendant did not recall speaking to the attorney and, if she did, could not remember what was said. Therefore, no attorney-client privilege was implicated by the State's line of questioning and the trial court properly allowed defendant's testimony.

## IV

[4] Finally, defendant contends the trial court erred in allowing the following statement by the State during its closing argument:

> We know then she went to other people, other friends and told them she had been raped. We know that . . . Jordan told you there was no rape, Monique Harmon told you there was no rape. We know that . . . Jordan tendered a plea of Guilty to Voluntary Manslaughter. I wonder if his lawyer would have brought him in here and ple[]d him guilty to Voluntary Manslaughter if there had been any evidence at all that he had shot a man trying to rape his wife.

Defendant argues the State's reference to the impact of the evidence on the decision of Jordan's attorney to pursue a plea for his client constituted an improper injection of personal beliefs and an argument based on matters outside the record. We disagree.

Our Courts have held "that it is improper for counsel to inject their personal beliefs or facts outside the record into jury arguments. However, counsel may argue all the facts in evidence as well as any reasonable inferences drawn therefrom." *State v. Williams*, 350 N.C. 1, 28, 510 S.E.2d 626, 644 (1999) (citation omitted). In the case *sub judice*, the State simply raised the reasonable question, inferred from the evidence adduced at trial, why Jordan's attorney would have allowed his client to enter a plea agreement to voluntary manslaughter if defendant had indeed been the victim of an attempted rape and there thus existed a possible defense for his actions. As this question was not an injection of personal beliefs and matters outside the record, this assignment of error is overruled.

No error.

Judges McCULLOUGH and TYSON concur.