IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-444

Filed: 20 October 2020

Rowan County, Nos. 12CRS053790; 17CRS001726-28

STATE OF NORTH CAROLINA

v.

KHALIL ABDUL FAROOK

Appeal by defendant from judgments entered on or about 10 October 2018 by Judge Anna M. Wagoner in Superior Court, Rowan County. Heard in the Court of Appeals 4 December 2019.

*Attorney General Joshua H. Stein, by Assistant Attorney General John W. Congleton, for the State.*

*Sarah Holladay, for defendant-appellant.*

STROUD, Judge.

Defendant appeals the trial court's denial of his motions to dismiss his case for violation of his Sixth Amendment right to a speedy trial. Because the State failed to carry its burden of proof as to the reason for delay in defendant's trial and as defendant has demonstrated prejudice from this delay, defendant's right to a speedy trial was violated, and thus we reverse the order denying defendant's motion to dismiss and vacate defendant's judgment.

I.    Background

The State's evidence showed that on 17 June 2012, defendant was driving when his vehicle collided with Mr. and Mrs. Jones, who were riding a motorcycle; both died from the collision. A blood sample was taken from defendant and submitted to the North Carolina State Crime Laboratory ("Crime Lab") for analysis on 28 June 2012. On 18 June 2012, warrants were issued for defendant's arrest on charges of felony hit and run resulting in death, driving while impaired, and resisting a public officer. On 19 June 2012, all three of the 18 June 2012 warrants were served and additional warrants were issued and served for two counts of felony death by vehicle. On 25 June 2012, pursuant to a search warrant seeking evidence for purposes of "D.N.A. collection, latent prints, trace evidence, document in the vehicle to show ownership" and evidence to assist in the "identification of the occupants[,]" law enforcement seized various items of evidence from defendant's vehicle, including swabs from various locations, the driver seat cushion, and a broken watch face. The samples were placed into "Temporary Evidence[.]"

On 2 July 2012, defendant was indicted for driving while impaired, resisting public officer, and two counts of felony death by vehicle. On 30 July 2012, defendant was indicted for reckless driving to endanger, driving left of center, driving while

license revoked, and felony hit and run resulting in two deaths. Defendant remained in jail awaiting trial from the date he was arrested, 19 June 2012.[1]

On 11 July 2012, Mr. James Randolph was appointed as defendant's counsel. On 10 December 2014, Mr. James Davis was assigned to defendant's case replacing Mr. Randolph. According to the trial court's findings of fact, on 25 March 2015, "[b]lood alcohol results [were] sent from State Crime Lab to District Attorney's Office." The blood sample was analyzed "to determine the alcohol concentration or presence of an impairing substance therein[;]" on 1 June 2015, the Crime Lab prepared the report, which did not state a blood alcohol level and was negative for all other substance tests. On 26 March 2015-- nearly three years after defendant's arrest -- a "[r]ush request [was] sent from Brandy Cook for expedited testing of DNA[,]" and on 17 April 2015, the "DNA analysis [was] completed."[2]

On 30 June 2017, Mr. Davis moved to withdraw from defendant's case. In the motion to withdraw, Mr. Davis alleged that "[a]fter extensive review and numerous conferences with Defendant, he had elected this month to proceed to trial." Mr. Davis further alleged that he "has a large criminal and civil trial practice, both in and out of county and in state and federal court[,]" including "a civil marital tort jury trial

---

[1] On defendant's judgment for second degree murder and attaining the status of violent habitual felon he was "given credit for 2304 days spent in confinement prior to the date of this Judgment[,]" approximately six and one-third years.

[2] District Attorney Brandy Cook was handling defendant's case in 2015.

currently set the week of September 25, 2017, in Stanly County, NC[;]" a "civil wrongful death jury trial tentatively set for October 23, 2017, in Davie County[;]" "four pending custody trials, a DWI trial, and many other district court trials[;]" "a capital murder trial on January 8, 2018 . . . anticipated to last four to five months[,]" along with eight mediations and one deposition in the next two months. Mr. Davis noted that under the "scheduling order" defendant had a deadline of 6 October 2017 to file motions and notices and that "the Special Prosecutor intends to calendar the trial of Defendant's cases during the latter part of 2017 or early 2018."

On 5 July 2017, Mr. Aaron Berlin and Ms. Sarah Garner, "Special Prosecutors from the North Carolina Conference of District Attorneys" eventually became the State's attorneys on this case. On 5 July 2017, defendant rejected a plea offer by the State for "RECKLESS DRIVING TO ENDANGER, FEL HIT/RUN SER INJ/DEATH, DWI, FELONY DEATH BY VHIECLE X 2, DWLR, DRIVE LEFT OF CENTER[.]" This same day, Mr. Davis's motion to withdraw as defendant's counsel was granted and Mr. David Bingham was appointed in his stead, and defendant's cases were calendared for an "administrative hearing" on 7 August 2017.

On 17 July 2017, defendant was indicted for two counts of second-degree murder and attaining the status of violent habitual felon. On 2 August 2017, defendant wrote to his attorney, Mr. Bingham, and requested he withdraw from the case. Defendant stated that his understanding was that "you are my brother-in-

law['s] attorney, and have been for years. . . . This will be a conflict of interest." Defendant requested that Mr. Bingham "ask one of these attorney[s] to take my case[,]" and listed three names. Defendant wrote, "My reason I ask this is because, Mrs. Anna Mills Wagoner the Resident Judge. She ask Mr. James Davis why didn[']t he ask other attorney before he put in his withdraw from my case." On 7 September 2017, defendant sent a note to the clerk of court noting he had mailed a motion to dismiss his court-appointed attorney, Mr. David Bingham; on 11 September 2017, the letter requesting Mr. David Bingham be dismissed was filed. On 13 September 2017, Mr. David Bingham filed a motion to be removed from the case. On 14 September 2017, Mr. Bingham filed a motion for appointment of expert and asking for appointment of an investigator to interview witnesses to the incident and to "help him locate and establish alibi witnesses." On 25 September 2017, the trial court appointed Mr. Chris Sease as defendant's counsel. On 28 September 2017, Special Prosecutor Garner filed and served upon defendant's counsel a "Motion for Reciprocal Discovery and Defenses[,]" (original in all caps), pursuant to North Carolina General Statute § 15A-905 and a "Discovery Disclosure Certificate, 15A-957 Notice, Request for and Consent to Reciprocal Discovery[.]"

On 2 October 2017, the trial court entered an order establishing dates for filing and hearing motions; all defense motions were to be filed by 4 December 2017 and motions were to be heard on 27 January 2018. On 22 January 2018, Mr. Sease and

Special Prosecutor Garner entered a consent agreement noting that defendant had "no pre-trial motions" and no reciprocal discovery to provide, while the State had "provided full discovery to the defendant" and afforded defendant's attorney "the opportunity to review in person the State's complete file[.]" The defendant also stipulated that "defendant uses the name Khalil Farook and was previously known as Donald Miller[.]"

On 19 March 2018, defendant sent the clerk of court a request for "information[] (motions) concerning my tr[ia]l delay for the years of 2013, 2014, 2015, 2016, 2017. That the District Attorney office file to delay my tr[ia]l. I need cop[ies] of each year." (Original in all caps.) A notation in different handwriting, apparently as the response from the Clerk's office, appears at the bottom: "There are no written motions in any of your files."[3] On 7 August 2018, the State filed a notice of expert witness, identifying Trooper D.H. Deal as an expert in "Crash/Accident Reconstruction" and noting the trial was set for the week of 24 September 2018. On 9 August 2018, the State dismissed the charges for reckless driving to endanger, driving left of center, DWI, resisting a public officer, and both counts of felony death.

On 6 September 2018, defendant filed a *pro se* motion requesting his case be dismissed "on the grounds that the defendant, . . . was deprived of effective assistance

---

[3] According to the record, the notation was correct, as no written motions had been filed regarding defendant's trial delay.

of counsel, and on flagrant violation of the Constitution of the United States and North Carolina, Amendment VI, VIII." (Original in all caps.) Defendant alleged that his appointed attorney, Mr. James Davis, did not speak to him until 57 months after he was appointed.[4] Defendant also alleged he never agreed to any delays in his trial and that he had been prejudiced both by his ineffective counsel and the delay. On 13 September 2018, defendant filed another *pro se* motion similar to his motion a week earlier but also added that his former counsel, Mr. David Bingham had also been ineffective.

On 18 September 2018, defendant's attorney, Mr. Chris Sease, filed a motion to dismiss defendant's case due to the violation of his constitutional rights to a speedy trial.[5] The motion to dismiss alleged, although the incident was on 17 June 2012, defendant was not charged or served with indictments for second degree murder, violent habitual felon, and habitual felon until 5 July 2017. Mr. Sease alleged that

---

[4] It is not clear how defendant calculated 57 months. Mr. Randolph, defendant's attorney, was appointed in July of 2012 and replaced by Mr. Davis in August of 2012, according to defendant's motion. Mr. Davis withdrew in July of 2017, approximately 59 months after his appointment. Mr. Davis' testimony indicates he did not have much interaction with defendant but had sent staff or other attorneys from his office to visit defendant. In any event, the general import of defendant's motion is clear.

[5] In defendant's motion to dismiss he based his argument on North Carolina General Statute § 15A-954(a)(3), "the Sixth Amendment to the Constitution of the United States of America, and Section Eighteen of Article I of the North Carolina Constitution." But on appeal defendant does not address his statutory argument; in fact, according to defendant's brief's table of contents, he does not even cite N.C. Gen. Stat. § 15A-954. Therefore, we address defendant's argument only as constitutional violations.

since defendant was incarcerated in the Rowan County Detention Center, he was easily accessible to the charging officer and District Attorney's Office and any failure to serve warrants on defendant was "through no fault of [defendant's] own." The motion also alleged defendant believed the warrants were "purposely held until after []he had rejected the State's plea officer and after his original counsel of record had withdrawn from this case, in an attempt to oppress, harass and punish him further." The motion to dismiss also noted when events occurred which we summarize in a timeline:

31 July, 2012      Indictment.

6 August 2012[6]   Case was calendared for this week but Mr. Randolph, counsel, withdrew.

8 August 2012      Mr. Davis appointed as counsel.

13 August 2012     Defendant entered not guilty plea.

18 February 2013   Defendant's case was calendared but not reached.

19 March 2013      Defendant's case was calendared but not reached.

16 April 2013      Defendant's case was calendared. New assistant district attorney was assigned to the case.

---

[6] 6 August 2012 is the date alleged in defendant's motion but the "ORDER OF ASSIGNMENT OR DENIAL OF COUNSEL" signed by the trial judge is dated 10 December 2014. There are discrepancies in the record, which may be clerical errors, regarding dates of appointment of defendant's attorneys. The dates shown by the actual orders appointing the attorneys are: by order signed 11 July 2012 – Mr. James Randolph was appointed; by order signed 10 December 2014, Mr. James Davis was appointed explicitly to replace Mr. Randolph; by order signed 5 July 2017, Mr. David Bingham was appointed; and by order dated 25 September 2017, Mr. Chris Sease was appointed. However, the "Case Events Inquiry" shows a "defense attorney name/type" change from James Randolph to James Davis on 8 August 2012. (Original in all caps.) It seems most likely Mr. Davis began representing defendant in 2012, despite the December 2014 order of appointment.

15 July 2015      Defendant's case was calendared but not reached.

13 February 2017   Defendant's case was calendared but not reached. Assistant District Attorney was released from the case, and it was assigned to the Conference of District Attorneys.

5 July 2017      Defendant was indicted for second degree murder, habitual felon, and violent habitual felon. Defendant's case was calendared for the week and not reached. Mr. Bingham was appointed as defendant's counsel and Mr. Sease was appointed to aid Mr. Bingham in going through discovery.

29 August 2017    Defendant's case was calendared but not reached.

26 September 2017 Defendant's case was calendared and not reached. Mr. Bingham withdrew and Mr. Sease became defendant's attorney.

8 January 2018    Defendant's case was calendared but not reached. A tentative trial date was set for September 2018.

The speedy trial motion alleged due to the extensive delay defendant was "prejudiced by an inability to adequately assist his defense attorney" in preparing for trial and by the second degree murder charges brought by the State long after the offense date: "Had his case been resolved in the years of 2012 through 2017 it is arguable that he would have never been charged with Second Degree Murder."

The State filed a brief with the trial court opposing the motion. Because the State's brief in opposition to the motion and the trial court's order are essentially identical, we will not separately address the State's contentions in its trial brief. A hearing was held regarding the alleged speedy trial violation on 24 September 2018, and on 8 October 2018, the trial court entered an order denying defendant's motion

to dismiss. The order on appeal is almost entirely a verbatim copy of the State's "Brief in Opposition to Defendant's Motion to Dismiss." (Original in all caps.) The *only* obvious differences between the State's brief and the order are the headings, transitions between the various sections, and the closing and signatures. In addition, much of the State's brief was not based on the court file or calendars but instead upon information provided by Mr. Davis, defendant's second attorney. For example, the State's brief, and thus the order, notes 13 March 2014 as a date when "Attorney from Davis office met with defendant" and that "James Davis retained our original court dockets from that session and does not have record of Defendant on any calendars[;]" this information is not in the documents from the court file in our record, and information regarding a defense attorney's visits with his client and office records would *not* be in the court file so it appears Mr. Davis must have provided this information to the State prior to the hearing for use in its brief which would ultimately become the order.

The next section of the State's Brief is entitled "ARGUMENT[;];" the corresponding section of the Order is entitled "FINDINGS[.]" The *only* difference between the "argument" and the "findings" is that the order omits the first sentence of the State's brief which states, "For the foregoing reasons, the State respectfully moves this Court to deny Defendant's motion to dismiss based on a speedy trial violation." We also note that despite the title, this portion of the order includes some

findings of fact but also extensively quotes cases addressing Sixth Amendment law; since the "findings" portion of the order is actually the "argument" portion of the State's brief, it naturally presents the State's legal argument and citation of cases. The actual findings of fact regarding the timeline of events are stated in the "TIMELINE" portion of the order.

Two sentences of the findings address "exhibit 1" regarding the State's "extensive backlog of . . . cases."[7] In the transcript, only two exhibits are noted on the "EXHIBITS" page as identified for the hearing regarding defendant's speedy trial motion: For the State, Exhibit "A," described in the transcript as "State's brief" and for defendant, Exhibit "1" described in the transcript as defendant's "ACIS printout, court dates[.]" In the body of the transcript, the State introduced ""Exhibit A"[8] and states,

> I would also introduce Exhibit A . . .
>
>     . . . .
>
> I filed a brief in response to this involvement, which I've attached all -- Exhibit A, all of the cases that I've -- that are discussed in my brief as well as the timeline of -- of what

---

[7] The "FINDINGS" are not numbered but are paragraphs of text, just as in the State's brief. These sentences are: "In the instant case, the State had an extensive backlog in Superior Court cases. From the week of July 2nd, 2012 through June 27th, 2016 the State tried mostly cases older than Defendant's case (see attached exhibit 1.)." Exhibit 1 was not attached to the order in our record.

[8] According to the text of the brief, the State's brief included an "attached exhibit 1" regarding the State's "extensive backlog in Superior Court cases." However, no exhibit was attached to the State's brief which appears in our record. At the hearing, it appears that the "exhibit 1" from the State's brief was identified as State's Exhibit A. We will refer to this exhibit as State's Exhibit A, as identified before the trial court.

Mr. Davis has discussed. I would also just ask the Court to take judicial notice of all of the motions and dates that were indicated in the Court file as well, which I'll discuss later.

(State's Exhibit No. A was admitted.)

Before the trial court, the State's argument regarding Exhibit A was:

I had introduced Exhibit A to talk about the backlog -- which shows the backlog that was in Superior Court at that time, but also to show how efficient and effective the State was at the time of making sure trials were being scheduled and heard. Mr. Davis also corroborated that during his testimony as well.

In response to the State's Exhibit A, defendant's counsel asked the trial court to take judicial notice of "Defendant's Exhibit No. 1[,]" which he described:

This is the ACIS printout –

. . . .

that was given to me by the clerk's office in preparation for this motion. And it -- it details every court date that has entered into ACIS by the clerk's office.[9] So as a matter of an attempt to -- I call like, the term "save face," as to why these dates are a little bit in dispute.
The dates that I'm using in my motion are from that instead of the other dates. I mean, obviously, Mr. Davis kept meticulous notes in docketing to verify when it was

---

[9] As noted, this exhibit, the "CASE EVENTS INQUIRY" printout, shows one of the discrepancies in dates regarding defendant's counsel. It provides:

08/08/12 . . . DEFENSE ATTORNEY NAME/TYPE CHANGE
FROM: RANDOLPH, JAMES DKF
TO:       DAVIS, JAMES

However, the actual "Order of Assignment or Denial of Counsel" in our record states "James Davis to replace James Randolph" and was signed on 10 December 2014. Mr. Randolph was originally appointed by order signed on 11 July 2012.

actually calendared, so that's I thought -- I wanted to make sure I substantiated what dates I'm using.

(Defendant's Exhibit No. 1 was identified.)

THE COURT:     Okay.  So you[] are referring not -- not placed on the actual calendars, but on the --

MR. SEASE:     Correct.

THE COURT:     -- print out from the clerk's office?

MR. SEASE:     From experience, if I went to the extent of going through each and every calendar to prepare this motion, I would not, for one, be compensated in time by IDS; two, I didn't have the time in my regular practice to do that at this time.

The State's brief on appeal does not address a single time defendant's case was actually calendared nor does it mention State's Exhibit A or attempt to explain how it would support its argument.[10]  State's Exhibit A is *not* a copy of court dockets or calendars showing cases scheduled and heard but simply a listing of weeks of court noting one or more cases tried that week.  There is no indication of how long any individual case took to be tried or how many other cases were on the calendar for the week which were not reached.  For example, these are the entries for two weeks:

SUPERIOR COURT WEEK OF MARCH 31, 2014

Jury trials:  Tia Livengood (2010 felony embezzlement) and William Kennedy (2012 felony habitual DWI).

---

[10] The State's brief failed to address either State's Exhibit A or defendant's Exhibit 1.

SUPERIOR COURT WEEK OF APRIL 7, 2014

Jury trials: Curtis Parrigden (2009 felony possession stolen goods) and Darryl Wright (2008 misdemeanor).

State's Exhibit A lists dates from 2 July 2012 to 27 June 2016 and notes jury trials, administrative weeks, and some days when no judge was available. Some of the weeks omitted are presumably holidays, such as the last week or two of December. For many months, only two weeks of the month are addressed. State's Exhibit A does not explain why some other weeks are omitted, and the weeks listed end about two years prior to Defendant's 2018 trial. Thus, even if State's Exhibit A includes some information regarding the "backlog" of cases, it does not address the last two years of the alleged delay.

In its "findings[,]" the trial court acknowledges the length of delay before defendant's trial, but determines that the State's backlog and defendant's failure to assert his right sooner indicate there was no violation. The trial court actually determined that *the State* was "significantly prejudiced" by the delay caused by its own backlog. The last sections of the brief and the order are entitled "CONCLUSION." The brief concludes with the State's two-sentence request to deny defendant's motion to dismiss. The order concludes with its two-sentence conclusion of law and is the entirety of the trial court's conclusions "of law" section. The trial court concluded, "For the foregoing reasons, this Court finds Defendant's right to a speedy trial was not violated."

Finally, on 8 October 2018, defendant's trial began, and after a trial by jury, the jury found defendant guilty of felony hit and run resulting in serious injury or death, and two counts of second-degree murder. Defendant entered plea agreements for the charges driving while license revoked and attaining the status of violent habitual felon; the trial court entered judgment ultimately sentencing defendant to life without parole. Defendant appeals.[11]

## II.     Right to a Speedy Trial

In June and July of 2012, defendant was indicted for driving while impaired, resisting a public officer, two counts of felony death by vehicle, reckless driving to endanger, driving left of center, driving while license revoked, and felony hit and run resulting in two deaths. Defendant's trial did not begin until 8 October 2018, over six years after defendant was indicted and arrested. Defendant first contends his Sixth Amendment right to a speedy trial under the United States Constitution and his Article I right to a speedy trial under the North Carolina Constitution has been violated, and thus the trial court erred in denying his motion to dismiss.

### A.     Standard of Review

---

[11] Defendant provided oral notice of appeal from his judgments but did not file a written notice of appeal from the written order denying his motion to dismiss; neither the State nor defendant addressed this issue. Upon our own initiative we exercise our discretion to invoke Rule 2 of our Rules of Appellate Procedure to consider defendant's appeal regarding the order denying his motion to dismiss for a speedy trial violation in order "[t]o prevent manifest injustice to" him. N.C. R. App. P. 2 ("To prevent manifest injustice to a party, or to expedite decision in the public interest, either court of the appellate division may, except as otherwise expressly provided by these rules, suspend or vary the requirements or provisions of any of these rules in a case pending before it upon application of a party or upon its own initiative, and may order proceedings in accordance with its directions.").

"When reviewing speedy trial claims, we employ the same analysis under both the Sixth Amendment and Article I." *State v. Washington*, 192 N.C. App. 277, 282, 665 S.E.2d 799, 803 (2008). "The standard of review for alleged violations of constitutional rights is *de novo.*" *State v. Wilkerson*, ___ N. C. App. ___, ___, 810 S.E.2d 389, 391 (2018) (citation and quotation marks omitted).

B.    *Barker* Factors

We consider defendant's allegation of a speedy trial violation under the balancing test set forth in *Barker v. Wingo*, 407 U.S. 514, 33 L.Ed. 2d 101 (1972).

> The Supreme Court of the United States laid out a four-factor balancing test to determine whether a defendant's Sixth Amendment right to a speedy trial has been violated. *Barker*, 407 U.S. at 530, 92 S.Ct. at 2191–92, 33 L.Ed.2d at 116–17. These factors are: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and, (4) prejudice to the defendant. None of these factors are determinative; they must all be weighed and considered together:
>
> > We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the constitution.

*Barker*, 407 U.S. at 533, 92 S.Ct. 2182, 33 L.Ed.2d at 118–19.

*Wilkerson* at ___, 810 S.E.2d at 392 (citations, quotation marks, and brackets omitted).  We thus turn to the *Baker* factors.  *See id.*

1.    Length of Delay

The delay in this case was over six years, clearly sufficient to create a presumption of prejudice to the defendant and  to "trigger the *Barker* inquiry:"

> The length of the delay is not *per se* determinative of whether defendant has been deprived of his right to a speedy trial.  No bright line exists to signify how much of a delay or wait is prejudicial, *but as wait times approach a year, a presumption of prejudice arises. Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S.Ct. 2686, 2690–91 n.1, 120 L.Ed.2d 520, 528 n.1 (1992).  This presumptive prejudice does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* inquiry.

*Id.* at ___, 810 S.E.2d at 392 (emphasis added) (citation, quotation marks, and brackets omitted).  The trial court's order acknowledges the length of time of the delay and the law regarding the presumption of prejudice but did not recognize the presumption of prejudice *to defendant* but instead turned to the other factors.  The trial court also determined "the State has been significantly prejudiced by the length of the delay."  We have been unable to find any prior case considering potential prejudice to the *State* from its own delay.  The Sixth Amendment right to a speedy trial is a right granted to the *defendant*, not the State.  *See* U.S. Const. amend. VI

("In all criminal prosecutions, *the accused* shall enjoy the right to a speedy and public trial[.]" (emphasis added)).

Six years is certainly a lengthy enough delay to create the "*prima facie* showing that the delay was caused by the negligence of the prosecutor." *Wilkerson* at ___, 810 S.E.2d at 393 ("This Court in *Chaplin* found a pre-trial delay of 1,055 days, with the case being calendared thirty-one times before being called, constituted a *prima facie* showing of prosecutorial negligence or willfulness. *Chaplin*, 122 N.C. App. at 664, 471 S.E.2d at 656. . . . This Court in *Strickland* concluded a delay of 940 days was enough to constitute a *prima facie* showing of prosecutorial negligence. *Strickland*, 153 N.C. App. at 586, 570 S.E.2d at 903."). Here, defendant's delay was over six years – over 2190 days -- and thus "a presumption of prejudice arises[,]" and this triggers the rest of the *Barker* inquiry. *Id.* at ___, 810 S.E.2d at 392.

2. Reason for Delay

Based upon the six-year delay, the burden of proof "to rebut and offer explanations for the delay" shifted to the State. *See id.* at ___, 810 S.E.2d at 392.

a. Burden of Proof of Reason for Delay

As noted above, the defendant carried his burden of showing that the "delay was particularly lengthy," as it was over six years. *Id.* at ___, 810 S.E.2d at 392. This delay creates a "*prima facie*" case that "the delay was caused by the negligence of the prosecutor[:]"

Defendant bears the burden of showing the delay was the result of neglect or willfulness of the prosecution. *If a defendant proves that a delay was particularly lengthy, the defendant creates a prima facie showing that the delay was caused by the negligence of the prosecutor.*

Once the defendant has made a *prima facie* showing of neglect or willfulness, *the burden shifts to the State to rebut and offer explanations for the delay.* The State is allowed good-faith delays which are reasonably necessary for the State to prepare and present its case, but is proscribed from purposeful or oppressive delays and those which the prosecution could have avoided by reasonable effort. Different reasons for delay are assigned different weights, but only valid reasons are weighed in favor of the State. *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192–93, 33 L.Ed.2d at 117.

*Id.* at ___, 810 S.E.2d at 392–93 (emphasis added and omitted) (citations, quotation marks, and brackets omitted).

We first note the trial court's order did not properly assign the shifted burden to the State. Instead, the trial court concluded *defendant* had the burden entirely and did not recognize that the six-year delay alone triggered "the burden shift[] to the State to rebut and offer explanations for the delay." *Id.* at ___, 810 S.E.2d at 392. Despite the trial court's order – which, as noted above, was a copy of the State's brief -- at the hearing, counsel for both defendant and the State recognized that the burden did shift to the State to present evidence regarding the reasons for the delay, and the State offered that evidence in the form of Mr. Davis's testimony. This brings us to one of defendant's other issues appeal, since the State presented evidence from only one witness regarding the reason for the delay: *defendant's* former attorney on this

very case, Mr. Davis.

> b.     Testimony by Defendant's Former Counsel

Defendant argues that "WHERE THE DEFENDANT'S PRIOR ATTORNEY TESTIFIED AGAINST HIM AT THE HEARING ON THE SPEEDY TRIAL MOTION, THE TRIAL COURT PLAINLY ERRED IN ADMITTING PRIVILEGED[12] AND CONFIDENTIAL TESTIMONY[.]"  The order states it was "based on the Court file and the sworn testimony of attorney James Davis on September 24, 2018 in open court[.]"  Indeed, instead of presenting testimony from the clerk of court or an assistant district attorney regarding the court dockets and calendaring of defendant's case and other cases, the State relied upon testimony from defendant's former counsel.  Mr. Davis testified generally about the court dockets but most of his testimony addressed his representation of defendant and his trial strategy; both of these subjects raise important questions of attorney-client privilege.[13]

---

[12] "A privilege exists if (1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although litigation need not be contemplated and (5) the client has not waived the privilege." *Berens v. Berens*, 247 N.C. App 12, 19, 785 S.E.2d 733, 739 (2016).

[13] Mr. Davis never mentioned the specific word "backlog."  Instead, the State relied on its Exhibit A. Before the trial court, the State noted: "I had introduced Exhibit A to talk about the backlog . . . . Mr. Davis also corroborated that during his testimony as well."

We first note that according the order appointing him as counsel, Mr. Davis was not appointed until 10 December 2014, over two years after defendant's arrest. But Mr. Davis testified that throughout 2013 part of his strategy was to give things time to "cool down."[14] Mr. Davis noted that Assistant District Attorney Seth Banks had told him if defendant did not plead guilty to the initial charges, he would charge defendant as "violent habitual felon[,]" which the State later did. Mr. Davis also testified that the second-degree murder indictments were filed only after plea negotiations had failed. During cross examination, Mr. Davis also noted while he was defendant's counsel "at no time" had the case been on a trial calendar, only administrative calendars. No actual calendars, administrative or trial, were offered as evidence.

At the hearing, defendant was represented by a new court-appointed attorney, who did not object to Mr. Davis's testimony, and thus we review this issue for plain error. *See State v. Lawrence,* 365 N.C. 506, 516, 723 S.E.2d 326, 333 (2012) ("[T]he North Carolina plain error standard of review applies only when the alleged error is unpreserved, and it requires the defendant to bear the heavier burden of showing that the error rises to the level of plain error.").

> For error to constitute plain error, a defendant must
> demonstrate that a fundamental error occurred at trial. To

---

[14] Again, as noted above, there is some uncertainty as to when Mr. Davis began representing defendant. Mr. Davis did not say anything about defendant's first attorney, other than noting he replaced him. Regardless of whether Mr. Davis was appointed in 2012 or 2014, our analysis would not change.

- 21 -

show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings[.]

*Id.* at 518, 723 S.E.2d at 334 (citations and quotations marks).

This is an exceptional case and the issue of a violation of attorney-client privilege in this context is a fundamental error which "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* The attorney-client privilege is one of the most important and well-established protections our legal system affords a criminal defendant:

> The public's interest in protecting the attorney-client privilege is no trivial consideration, as this protection for confidential communications is one of the oldest and most revered in law. The privilege has its foundation in the common law and can be traced back to the sixteenth century. The attorney-client privilege is well-grounded in the jurisprudence of this State. When the relationship of attorney and client exists, all confidential communications made by the client to his attorney on the faith of such relationship are privileged and may not be disclosed.
> There are exceptions to this general rule of application to all communications between a client and his attorney . . . .
> The rationale for having the attorney-client privilege is based upon the belief that only full and frank communications between attorney and client allow the attorney to provide the best counsel to his client. The privilege rests on the theory that encouraging clients to make the fullest disclosure to their attorneys enables the

latter to act more effectively, justly and expeditiously—benefits out-weighing the risks of truth-finding posed by barring full disclosure in court.

In considering whether an attorney can be compelled to disclose confidential attorney-client communications, it is noteworthy that unlike other profession-related, privileged communications, the attorney-client privilege has not been statutorily codified. In article 7 of chapter 8 of our General Statutes, relating to competency of witnesses, the General Assembly has specifically addressed a method for disclosure of privileged communications. In N.C.G.S. § 8–53, the General Assembly has established the privilege for confidential communications between physician and patient, providing that confidential information obtained in such a relationship shall be furnished only on the authorization of the patient or, if deceased, the executor, administrator or next of kin of the patient. This statute further provides that any resident or presiding judge in the district, either at the trial or prior thereto, or the Industrial Commission pursuant to law may, subject to N.C.G.S. § 8–53.6, compel disclosure if in his opinion disclosure is necessary to a proper administration of justice. Our General Assembly has also provided this same disclosure procedure and basis in its creation of the privilege for communications between psychologist and patient (N.C.G.S. § 8–53.3 (2001)), in the school counselor privilege (N.C.G.S. § 8–53.4 (2001)), in the marital and family therapy privilege (N.C.G.S. § 8–53.5 (1999)), in the social worker privilege (N.C.G.S. § 8–53.7 (1999)), in the professional counselor privilege (N.C.G.S. § 8–53.8 (2001)), and in the optometrist-patient privilege (N.C.G.S. § 8–53.9 (2001)).

With respect to statutorily established privileges, we also find it notable that with other types of privileged communications, such as the clergyman privilege, the General Assembly has made these in essence absolute by not including any provision for a judge to compel disclosure if in his opinion disclosure is necessary to a proper administration of justice. Significantly, our General Assembly has not seen fit to enact such statutory

provisions for the attorney-client privilege, and we must look solely to the common law for its proper application.

*In re Miller*, 357 N.C. 316, 328–30, 584 S.E.2d 772, 782–83 (2003) (citations, quotation marks, and brackets omitted).

Both attorney-client privilege and work-product privilege apply to criminal prosecutions:

> Attorney-client communications are privileged under proper circumstances. A similar qualified privilege protects criminal defendants from disclosure of the work of attorneys produced on behalf of such defendants in connection with the investigation, preparation or defense of their cases. *Both the attorney-client privilege and the work product privilege, however, are privileges belonging to the defendant* and may be waived by him.

*State v. Taylor*, 327 N.C. 147, 152, 393 S.E.2d 801, 805 (1990) (emphasis added) (citations omitted).

Although there are exceptions to both the attorney-client privilege and work-product privilege, the State has not identified or argued that any particular exception to attorney-client privilege would apply to this case. Instead, the State responds to defendant's argument regarding violation of his attorney-client privilege by arguing that "defendant waived attorney client privilege and work . . . privilege with regard to trial strategy *when he acquiesced to the strategic delay in trial*." (Emphasis added.) (Original in all caps.) The State continues,

> [I]n the context of defendant's argument regarding a speedy trial violation, the material issue is not whether

defendant and his counsel communicated about strategy. Rather, the material issue is whether or not defendant acquiesced in the delay. There is no evidence that this strategic decision was an attorney-client privileged communication. The actual employment of a trial strategy of delay does not itself constitute a communication from defendant such that it is afforded the protections of the attorney-client privilege. Rather, if anything, such strategy should be protected by the work product doctrine.

But the State has not argued any of the established exceptions or methods of waiver of the privilege.[15] The State cites no legal authority in support of its theory of Defendant's tacit waiver of attorney-client privilege by acquiescence to a "strategic delay in trial." The State's argument first *assumes* that defendant did in fact knowingly and intentionally acquiesce in Mr. Davis's "strategic decision" to delay trial, but it is the *State's* burden to prove this fact. The State's entire explanation of the six-year trial delay is that defendant had agreed to the delay. Since Mr. Davis did not personally meet with or talk to defendant until more than three years had passed since he was appointed, based upon the unrefuted facts, Mr. Davis could not have obtained Defendant's consent to a trial strategy of delay, nor could he have testified based upon any particular statement by defendant to him during that time

---

[15] A defendant waives attorney-client privilege for purposes of a motion for ineffective assistance of counsel. *See generally State v. Taylor*, 327 N.C. 147, 152, 393 S.E.2d 801, 805 (1990) ("By alleging in his amended motion for appropriate relief that his court-appointed attorney, the Public Defender, rendered ineffective assistance of counsel during the trial and direct appeal of these cases, the defendant waived the benefits of both the attorney-client privilege and the work product privilege, but only with respect to matters relevant to his allegations of ineffective assistance of counsel."). Defendant filed a *pro se* motion alleging ineffective assistance of counsel, but his counsel did not file a motion for ineffective assistance of counsel, and the trial court did not consider defendant's *pro se* motions.

period, although others from his office could have discussed these matters with defendant and communicated this to Mr. Davis. But this does not eliminate the issue of attorney-client privilege, which also extends to an attorney's agents. *See generally State v. Murvin*, 304 N.C. 523, 531, 284 S.E.2d 289, 294 (1981) ("Communications between attorney and client generally are not privileged when made in the presence of a third person *who is not an agent* of either party." (emphasis added)).

And even if we assume *arguendo* that Mr. Davis's testimony regarding his "strategic decision" to let things "cool down" when he began representing defendant was not protected by attorney-client privilege, this would explain perhaps a year or two of the six-year delay; it does not address the majority of the delay. The State also has the burden to explain the additional four or five years.

The State also argues that Mr. Davis's "trial strategy" was not a protected communication but rather "work product." Although the work-product privilege normally applies to documents or other materials, the essence of the privilege is protection of "an attorney's impressions, opinions, and conclusions or his legal theories and strategies[:]"

> The work product doctrine applies in criminal as well as civil cases. It is a qualified privilege for certain materials prepared by an attorney acting on behalf of his client in anticipation of litigation. The doctrine has been extended to protect materials prepared for the attorney by his agents as well as those prepared by the attorney himself.
> The doctrine was designed to protect the mental processes of the attorney from outside interference and

provide a privileged area in which he can analyze and prepare his client's case. Only roughly and broadly speaking can a statement of a witness that is reduced verbatim to a writing or a recording by an attorney be considered work product, if at all. It is work product only in the sense that it was prepared by the attorney or his agent in anticipation of trial (in this case, by the police for the district attorney). Such a statement is not work product in the same sense that an attorney's impressions, opinions, and conclusions or his legal theories and strategies are work product.

     As pointed out in *United States v. Nobles, supra*, the work product privilege, like any other qualified privilege, can be waived. The privilege is certainly waived when the defendant or the State seeks at trial to make a testimonial use of the work product. By electing to use Fragiacomo as a witness the State waived any privilege it might have had with respect to matters covered in his testimony.

*State v. Hardy*, 293 N.C. 105, 126, 235 S.E.2d 828, 840–41 (1977) (citations omitted).

Even if we were to assume that defendant's former counsel's "impressions, conclusions, opinions and legal theories" regarding his defense of defendant could be considered "work product," those are privileged just as a document setting forth those processes in writing would be. *See North Carolina State Bar v. Harris*, 139 N.C. App. 822, 824–25, 535 S.E.2d 74, 76 (2000) ("[T]he attorney-work product rule, which is a qualified privilege for witness statements prepared at the request of the attorney and an almost absolute privilege for attorney notes taken during a witness interview. *Also, under the attorney-work product rule, the mental impressions, conclusions, opinions and legal theories of an attorney are absolutely protected from discovery regardless of any showing of need.* North Carolina recognizes the attorney-work

product rule under N.C. Gen. Stat. § 1A–1, Rule 26(b)(3) (1990). Under that statute, attorney-work product is defined in relevant part to include, among other things, materials prepared in anticipation of litigation or for trial by or for another party or by or for that other party's agent. Such evidence may be obtained by a party "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." (emphasis added) (citations, quotation marks, and ellipses omitted)).

Mr. Davis's communications with defendant and his trial strategy were protected by attorney-client privilege. *See generally in re Miller*, 357 N.C. at 328–30, 584 S.E.2d at 782–83. Even if portions of Mr. Davis's testimony regarding the court calendars in Rowan County or his other cases did not reveal privileged information, neither the State nor the trial court made any attempt to limit his testimony to this sort of public information. If the strategic trial decisions that the State contends defendant agreed to in consultation with his attorney are not protected, then it is difficult to fathom the communication or work product which *could* be protected. And even if Mr. Davis did have a trial strategy of delay, if he failed to communicate that strategy to defendant, defendant could not agree to it. To show defendant's knowing acquiescence to Mr. Davis's trial strategy – which is the basis of the State's waiver argument -- the State would have to show that defendant's counsel communicated his

strategy to defendant, and he did actually agree.

The trial court thus erred in allowing Mr. Davis to testify against defendant where defendant had not waived his attorney-client privilege. To demonstrate plain error, defendant must also "establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334.

The State's *only* evidence to rebut the *prima facie* showing of a violation of defendant's right to a speedy trial was erroneously admitted in violation of his attorney-client privilege, and without this evidence, the State could not carry its burden of attempting to explain the trial delay and defendant's motion should have been allowed. We conclude the erroneous admission of the State's evidence had "a probable impact" on a jury finding defendant guilty as there would have been no trial without it, since defendant's case would have been dismissed for the speedy trial violation. We therefore conclude the trial court plainly erred in allowing Mr. Davis to testify against his former client. We will thus disregard the entirety of Mr. Davis's testimony regarding his "trial strategy" of delay and any findings of fact based upon that testimony.

c.  Evidence of Reasons for Delay

Turning back now to the State's asserted reasons for the delay, without Mr. Davis's testimony, the State has given no explanation or excuse for the delay. The

State could have presented testimony regarding some of the information in Mr. Davis's testimony from the assistant district attorneys who dealt with the case and who discussed the case with Mr. Davis.[16]  Even if we consider the evidence and information in the court file, this simply establishes the basic timeline of events and these facts were not in dispute.  Defendant's case was not scheduled for trial by the State, and it was on an administrative calendar only a few times during the six years preceding trial.  The State did not even *request* analysis of the DNA evidence until approximately three years after defendant was arrested.  Otherwise, the State did not present any evidence regarding the reasons for the delay other than from defendant's former counsel.  The State failed to meet its burden "to rebut and offer explanations for the delay."  *Wilkerson,* ___ N.C. App. at ___, 810 S.E.2d at 392.

It is important at this point that we not speculate or move beyond the evidence we have before us.  The burden here was on the State, and since we must disregard Mr. Davis's testimony given in violation of defendant's attorney-client privilege, the State failed to provide any explanation for years of the delay.  This Court can only conclude that prong two, the reason for the delay, weighs against the State.  It was the State's burden to explain the delay or produce admissible evidence the delay was due to defendant's own actions or caused by some other valid reason, but the State

---

[16] The State's brief and trial court's order also includes findings in the "timeline" regarding some dates of conversations or communications between Mr. Davis and several assistant district attorneys, although the State did not present any witnesses other than Mr. Davis.

presented no such competent evidence and the court file does not show this occurred.

Even on appeal, apparently recognizing the absence of evidence in the record,

the State discussed no details of its case backlog as a justification for the delay of

defendant's case but instead argues in a footnote of its brief:

> [t]his Court has previously noted the existence of a
> backlog of cases and lack of available prosecutorial staff
> in Rowan County during this same time period in its
> recent published opinion in State v. Farmer, ___ N.C. App.
> ___, ___, 822 S.E.2d 556, 560 (2018). In Farmer, this court
> found no speedy trial violation despite a delay of
> approximately five and a half years between the institution
> of charges and the trial.

This Court cannot rely upon factual findings in *Farmer* to review the trial

court's order in *this case*; the State cannot carry its burden of production of factual

evidence regarding the reasons for delay in this case only by citation to other cases,

even from the same judicial district and during the same general time period. One

obvious reason is the difference in the facts of each case. In *Farmer*, the trial court

found, and this Court also determined, that although the backlog was a "primary

cause" of the delay, the defendant had also contributed to the delay by requesting

funds to obtain an expert witness, and he agreed to continue the case:

> Specifically, defendant contends that the State allowed his
> case to be idle while there were 77 administrative sessions
> and 78 trial sessions between 2012 and 2017. The State
> acknowledged that there was a considerable delay in
> calendaring defendant's case. However, *the State
> presented evidence of crowded dockets and earlier pending
> cases given priority as a valid justification for the delay.*

According to the record, it is undisputed that the primary cause for defendant's delayed trial was due to a backlog of pending cases in Rowan County and a shortage of staff of assistant district attorneys to try cases. The State asserts that, at minimum, defendant also played a role in the delay as the record shows defendant was still preparing his trial defense as of late 2014 when he requested funds to obtain expert witnesses. Significantly, *defendant filed his motion for a speedy trial after he agreed to continue his case to the next trial session in 2017.* Thus, defendant himself acquiesced in the delay by waiting almost five years after indictment to assert a right to speedy trial.

*State v. Farmer*, ___ N.C. App. ___, 822 S.E.2d 556, 560 (2018) (emphasis added).

Here, the State failed to present any meaningful evidence regarding the "crowded dockets and earlier pending cases given priority as a valid justification for the delay" and defendant did not agree to any continuances. *Contrast id.* Here, there is *no evidence* in the record supporting the backlog of cases, other than a general use in argument of the word "backlog" and the listing of cases tried during some weeks of court in State's Exhibit A. As noted above, State's Exhibit A fails to address the final two years of the delay, so even if it explained some of the delay, the State failed to address a large portion of the delay. As in *Farmer*, the State must do more than assert a general "backlog" of cases. *See id.* This factor weighs against the State heavily. We thus turn to the third prong.

3.     Defendant's Assertion of His Right to a Speedy Trial

During the pendency of his case, defendant filed two *pro se* motions to dismiss

his case due to speedy trial violations, and his attorney filed one, all in September of 2018. The trial court's order "weighs heavily" against defendant that he "merely filed a motion to dismiss for speedy trial" rather than "a demand for speedy trial[.]" Since, as discussed above, we must disregard the trial court's findings regarding defendant's acquiescence in any delay as well as Mr. Davis's testimony this factor carries little weight. We also note defendant sent earlier pro se communications to the trial court, and although they did not use the words "speedy trial," they do express defendant's desire for information regarding why his case was not proceeding. We turn to the final prong.

4.    Prejudice

Last, as to prejudice, defendant argued in his motions to dismiss that he has been unable to adequately prepare for trial or garner witnesses in his defense. Defendant was arrested in 2012, but the State waited until 2017 to file two charges of murder -- far more serious charges than the State initially filed. We need not speculate what the prejudice of the delay might have been as the delayed murder charges resulted in life imprisonment without parole. If defendant had been tried and convicted on the charges initially filed, he could not have been subjected to life imprisonment without possibility of parole. Defendant was not charged with murder for over five years after the date of his arrest, and defendant was in jail for the entire time. Defendant's imprisonment and the State's delay in imposing far more serious

charges support his claim of prejudice, as he was unable to assist in his trial preparation and attempt to find potential witnesses and other evidence which would have been more readily available six years earlier. Further, the delay of six years is so substantial, the delay alone indicates prejudice, particularly given that fact that the State presented no competent evidence justifying the delay.

Because the Sixth Amendment right to a speedy trial protects only the defendant and not the State, the trial court erred in considering alleged prejudice to the State by the delay. In addition, we note the State was ultimately not "significantly prejudiced" or even slightly prejudiced by the delay as it obtained convictions for second-degree murder and attaining the status of violent habitual felon, charges it elected to bring five years after the incident. This factor weighs heavily against the State.

C.    Summary

In conducting the analysis directed by *Barker*, we find that every factor weighs either in favor of defendant, against the State, or not clearly in favor of either party. The State did not meet its burden of explaining valid reasons for the six-year delay of trial. Even if we were to assume that Mr. Davis's initial trial strategy of letting things "cool down" was proper for our consideration, this alleged strategy would explain less than half of the delay. Finally, the delay at issue here is so substantial that its duration alone speaks to prejudice, a reality only underlined by the State's

failure to justify or explain it. We must therefore vacate defendant's judgments due to a violation of his constitutional rights to a speedy trial. Accordingly, we need not address defendant's other issues on appeal.

## III.    Conclusion

Based upon the delay of over six years from defendant's arrest until his trial, because the State failed to carry its burden of presenting valid reasons for the delay, we reverse the trial court's order denying defendant's motion to dismiss and vacate defendant's judgment.

REVERSED and VACATED.

Judges ARROWOOD and BROOK concur.